[No. A097680. First Dist., Div. Two. July 23, 2002.]

JEHAD BAQLEH, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

Kimiko Burton, Public Defender, Randall Martin and Michael N. Burt, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, Robert Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, and Jeffrey M. Laurence, Deputy Attorney General, for Real Party in Interest.

## OPINION

KLINE, P. J.—If during the pendency of a criminal action and prior to judgment counsel informs the court he or she believes the defendant is or may be mentally incompetent, the court shall suspend the criminal proceedings and order that the question of the defendant's mental competence be determined at a trial of that question by court or jury. (Pen. Code, § 1368.)[1] Thereafter, "[t]he court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant." (§ 1369, subd. (a).)

This case presents the questions whether a court that has ordered a hearing pursuant to section 1369 may not only appoint its own expert but also order the defendant to submit to examination by an expert retained by the prosecution and, if so, the nature of the examination that may be ordered and the consequences of a defendant's refusal to submit.

### Facts and Proceedings Below

Petitioner is the defendant in a special circumstance murder case pending in respondent court for which the People are seeking the penalty of life in prison without the possibility of parole.

On September 25, 2001, when petitioner was brought before respondent court for arraignment on a superseding indictment, his counsel informed the court that, based on an oral report from a psychiatrist, he had a doubt as to whether petitioner was competent to be arraigned. Stating that counsel's representation "raises an issue in my mind whether or not [petitioner is] competent to be arraigned," the court suspended the proceedings and ordered that petitioner be evaluated by Jonathan E. French, Ph.D., a clinical psychologist. The questions put to Dr. French by the court were whether petitioner is "presently able to understand the nature and purpose of the proceedings taken against him, and can he prepare and conduct his own defense in a rational manner with or without counsel?"

Dr. French conducted two clinical interviews with petitioner, administered three psychological tests and reviewed numerous documents and reports

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

relating to petitioner. Included in the written materials Dr. French reviewed were the reports of three experts retained by petitioner, which were provided by petitioner's counsel: the "Confidential Psychiatric Report" of Roderick W. Pettis, M.D., a "neuropsychological evaluation" by Dale G. Watson, Ph.D, a psychologist, and a "confidential report" prepared by Myla H. Young, Ph.D., also a psychologist.

At the conclusion of his nine-page report, Dr. Pettis opined that, "to a reasonable degree of medical certainty, Mr. Baqleh suffers from a developmental disability. That is, his intellectual functioning is in the mild mental retardation to borderline intellectual range and that defect renders Mr. Baqleh incapable at this time of fully understanding the charges against him and of providing rational assistance to defense counsel." Dr. Pettis also expressed a "concern" that "Mr. Baqleh may be psychotic or subject to psychotic decompensation," and that this may also diminish his ability to assist counsel. Dr. Watson felt it "probable" that petitioner "fits the criteria for mental retardation." He stated that "[n]europsychological measures revealed significant deficits in memory and executive functions," and that these deficits, "which are likely developmental in nature," have had "a profound impact on his ability to reason and problem solve independently." Dr. Young, whose "brief interview" with petitioner appears to have consisted primarily of administration of a Rorschach test, concluded that petitioner's responses indicate "psychotic thinking," a tendency to frequently "misunderstand" and sometimes "grossly distort" situations, and an inability "to separate his fantasy from reality."

Dr. French, the court-appointed expert, disagreed with the conclusions of petitioner's three experts. On the basis of his own interviews and the psychological tests he administered to petitioner, Dr. French concluded "that Mr. Baqleh has an adequate (if occasionally limited) understanding of the nature and purpose of the proceedings now taken against him . . . . Were one to eliminate cultural factors from the equation, I question whether this would even be an issue. Furthermore, it seems to me that Mr. Baqleh has an adequate (if occasionally limited) capacity for cooperating with counsel in a rational manner. True, he is naive and a bit 'slow'; but he is not mentally retarded or seriously brain damaged. I am even more persuaded that Mr. Baqleh does not suffer from a serious mental disorder, let alone 'an active psychosis.' Although defense experts have suggested as much, one even recommending 'transfer to a hospital setting' and treatment with anti-psychotic medication, it remains the case that Mr. Baqleh has no psychiatric history whatsoever and that Jail Psychiatric Services (which has observed the man regularly for the past 2½ years) has consistently ruled out anything remotely resembling psychosis or any other condition which would

undermine this defendant's trial competence." According to Dr. French, "Mr. Baqleh is an emotionally inadequate immigrant of modest intellectual endowment who, for these very reasons, has not been entirely acculturated. He has his limitations, to be sure, and he may not have amounted to much thus far in life. Yet I do not believe that his limitations, such as they are, rise to the level of a mental 'defect' or 'disorder' as either described or implied in Section 1367 et seq. of the Penal Code." .

On January 2, 2002, after Dr. French submitted his report to the court and the parties, the People filed a motion seeking an order compelling petitioner "to submit to a psychiatric and/or further psychological examination by experts retained by the District Attorney." Noting that petitioner had engaged three experts and anticipating they would be called to testify at the trial on the question of mental competence, the motion stated that "[i]n order to balance and counter this evidence, the People have retained the services of a forensic psychiatrist to testify in this matter . . . in addition to Dr. French, who is a psychologist. The People anticipate that we will require such testimony because we believe the defense will make claims about Defendant's competence more properly addressed by a psychiatrist, or a psychiatrist acting in conjunction with a psychologist, than a psychologist acting alone." Asserting that its unidentified expert needed access to petitioner to conduct interviews and possibly to administer additional testing, the People asked the court to order petitioner to submit to interviews and testing by "experts of the People's choosing." The People also requested an order that the interviews be videotaped, "to preserve the best possible record in case there is a dispute over what happened in the interrogation room."

Petitioner simultaneously opposed the People's motion and filed his own motion to have petitioner examined instead by the director of the regional center for the developmentally disabled, pursuant to section 1369. Subdivision (a) of section 1369 provides that "[i]f it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code, or the designee of the director, to examine the defendant."

At a hearing on the motion held on January 29, 2002, the court determined that petitioner had made out a prima facie case he was developmentally disabled and that the director of the regional center for the developmentally disabled should therefore be appointed to evaluate him and submit a report to the court. The People agreed, but maintained that referral to the director of the regional center did not eliminate the need for an order directing petitioner to submit to examination by its designated expert. The court,

observing that it clearly had authority to appoint another doctor to evaluate petitioner, felt that the question whether it could order a defendant to submit to examination by a prosecution expert, and whether it could require that such an examination be videotaped, were issues of "first impression." The court resolved the question by both appointing the regional director for the center for the developmentally disabled, as requested by petitioner, and ordering that petitioner submit to an evaluation by a psychiatrist retained by the prosecution and the videotaping of interviews conducted by that psychiatrist, as requested by the People. The court also stated that if petitioner refused to submit to examination by the prosecution's expert, "this evaluation could be used, in my opinion, against him at any further proceedings."

On February 5, 2002, petitioner filed a petition for writ of mandate/prohibition in this court. We summarily denied the petition, noting in our order "that the superior court is bound by the rule of immunity set forth in *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] and *People v. Weaver* (2001) 26 Cal.4th 876 [111 Cal.Rptr.2d 2, 29 P.3d 103]" (which hold that statements made by a defendant to a psychiatrist or psychologist appointed under § 1369 may not be used in trial of the issue of the defendant's guilt). Petitioner sought review by the Supreme Court and, on February 27, 2002, that court granted review and transferred the case back to this court directing us to vacate our order denying mandate and to issue an alternative writ. The Supreme Court also ordered that the stay order it issued on February 14, 2002, remain in effect pending further order of this court. On March 7, 2002, we issued an order to show cause why a peremptory writ of mandate should not issue, as prayed for in the petition.

## DISCUSSION

Petitioner challenges the trial court's order on the grounds that it (1) exceeds the jurisdiction of the trial court because it grants the prosecution pretrial discovery not authorized by any applicable statute, and (2) deprives him of rights under the Fifth and Sixth Amendments to the United States Constitution and counterpart provisions of the California Constitution.

As the issues presented are all entirely legal in nature, we employ our independent judgment. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Diamond Benefits Life Ins. Co. v. Troll* (1998) 66 Cal.App.4th 1, 5 [77 Cal.Rptr.2d 581].)

I.

*The Trial Court Had Authority to Order Petitioner to Submit to a Competency Evaluation Conducted by a Prosecution Expert but it Exercised that Authority in a Manner That Does Not Comport With the Applicable Discovery Statutes.*

"A person cannot be tried or adjudged to punishment while mentally incompetent. (§ 1367, subd. (a).) A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Ibid.*) ▮ When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citations.] 'Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' [Citation.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

The statutory scheme relating to the determination of competency is set forth in sections 1367, 1368 and 1369. Section 1367 declares that "[a] person cannot be tried or adjudged to punishment while that person is mentally incompetent,"[2] and that "[a] defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder *or* developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a), italics added.) Section 1368 states in material part that where, as in this case, "counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Section[] . . . 1369," and that when such an order has been issued, "all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." (§ 1368, subds. (b) & (c).) Section 1369, which relates to the order of proceedings in a trial of the issue of mental competence, states that, to begin with, "[t]he court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. . . . If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the

---

[2]"Of course, trial of an incompetent defendant [also] violates an accused's right to due process." (*People v. Weaver, supra,* 26 Cal.4th 876, 903, citing *Medina v. California* (1992) 505 U.S. 437, 448 [112 S.Ct. 2572, 2578-2579, 120 L.Ed.2d 353]; *Pate v. Robinson* (1966) 383 U.S. 375, 378 [86 S.Ct. 836, 838, 15 L.Ed.2d 815]; *People v. Hale* (1988) 44 Cal.3d 531, 539 [244 Cal.Rptr. 114, 749 P.2d 769]; *People v. Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942].)

regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code, or the designee of the director, to examine the defendant." (§ 1369, subd. (a).)

The developmental disability that may result in mental incompetence is different from the mental disorder that may also have that result. For the purpose of competency determinations, " 'developmental disability' means a disability that originates before an individual attains age 18, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for the individual, and shall not include other handicapping conditions that are solely physical in nature. . . . [T]his term shall include mental retardation, cerebral palsy, epilepsy and autism . . . [and] also . . . handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals . . . ." (§ 1370.1(a)(1)(H).)

At the time counsel for petitioner informed the court that one or more defense experts had advised him that petitioner was mentally incompetent, counsel apparently assumed such incompetence resulted from a "mental disorder" rather than a "developmental disability," since counsel did not then request appointment of the director of the regional center. It was only after he received the written reports of Dr. Pettis and Dr. Watson, indicating petitioner suffered a developmental disability, that counsel advised the trial judge that petitioner was mentally incompetent "as a result of a *combination* of a developmental disability and a mental disorder" (italics added), and requested evaluation of petitioner by the director of the regional center for the developmentally disabled to supplement the evaluation by Dr. French, which did not address the issue of developmental disability. The parties agree that Dr. French was appointed to advise the court whether petitioner was mentally incompetent due to a mental disorder and the director of the regional center was appointed to help the court determine whether petitioner was incompetent due to a developmental disability. The parties also agree, as we do, that section 1369 provides the court authority to make the dual appointments. (See *People v. Kelly* (1992) 1 Cal.4th 495, 541-542 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Petitioner argues, however, that "respondent court lacked jurisdiction to appoint the prosecutor's retained expert and was required instead to appoint only the director of the regional center for the developmentally disabled." Petitioner reads section 1369 as providing that in a situation such as that presented here, in which the defendant is seeking a finding of mental incompetence, "it is the court, not the District Attorney, who chooses the appropriate experts." Petitioner's argument misrepresents the issue.

The question in this case is not whether the court has jurisdiction to appoint an expert retained by the prosecution, because the prosecution never requested any such appointment and none was made by the court. What the district attorney requested and the court granted was instead an order directing petitioner to submit to evaluation by an expert retained by the People. Anticipating the court-appointed psychologist might be unable to fully address issues raised by the defense psychiatrist, the prosecution believed it needed its own psychiatrist. The prosecution's forensic psychiatrist could not testify credibly, however, unless he or she had the same access to petitioner that the defense experts enjoyed. Thus, the People maintain the trial court order directing petitioner to submit to evaluation by its expert was necessary to eliminate the unfair tactical advantage the defense would otherwise enjoy, and the court possessed authority to issue the order.

Petitioner's chief argument is that the only discovery the trial court was authorized to grant is that specified in the Penal Code (§ 1054 et seq.), which does not provide for the mental examination of an accused person. Although there is a constitutional dimension to this claim, which we address separately, it rests primarily on *People v. Castro* (2000) 78 Cal.App.4th 1402 [93 Cal.Rptr.2d 770] (*Castro*).

In *Castro* the trial court denied defense counsel's request to appoint the director of the regional center for the developmentally disabled to evaluate the defendant pursuant to section 1369, despite substantial evidence raising a suspicion that the defendant was developmentally disabled. Among other things, a defense psychologist determined that the defendant had the intelligence of an average six- to seven-year-old, and an intelligence quotient (IQ) level between 55 and 65. (*Castro, supra*, 78 Cal.App.4th at p. 1412.) The Court of Appeal reversed both the sentence imposed by the court and the adjudication of guilt on the ground that there was no evaluation of the defendant's developmental disability by the regional director at any time prior to her plea or sentencing. The court pointed out that "neither Dr. Velosa nor Dr. Burdick, the court-appointed psychiatrists, made any attempt to determine [the defendant's] intelligence level or assess the extent of her developmental disability. Both merely described her as having some unspecified learning disability based upon [her] statements that she had been in special education classes. It is clear from their reports that both Dr. Velosa's and Dr. Burdick's examinations of [the defendant] focused on whether she had any mental disease or mental illness, *which is an entirely separate basis for a finding of incompetency than developmental disability*." (*Id.* at p. 1418, italics added.) At no time did the defendant receive "the proper competency hearing to which she was legally entitled." (*Id.* at p. 1419.) Without an

evaluation of any developmental disability, "and a consideration of that evaluation prior to ruling on competency, all subsequent proceedings are invalid because the trial court acted in excess of its jurisdiction." (*Ibid.*)

The particular language in *Castro* upon which petitioner relies is that "[w]hen the relevant statutes set forth a specific procedure to be followed in determining whether a defendant is competent to stand trial, and those procedures have not been adhered to, the fundamental integrity of the court's proceedings has been compromised. Due process requires that any doubt regarding the defendant's competency be properly evaluated by experts prior to proceeding with trial." (*Castro, supra,* 78 Cal.App.4th at p. 1419, italics omitted, citing *People v. Harris* (1993) 14 Cal.App.4th 984, 995 [18 Cal.Rptr.2d 92].) ▮▮ Petitioner's reliance on this language reflects his belief that, because section 1369 (and the discovery provisions of the Penal Code) do not *explicitly* authorize a trial court to order a defendant to submit to examination by an expert retained by the prosecution, there is no such authority, and the granting of such an order in this case therefore exceeded the jurisdiction of the court. This view finds no support in *Castro*. The trial court in that case acted in excess of its jurisdiction because it failed to fully explore the issue of developmental disability in response to the production of evidence of that possibility by the defense, as mandated by section 1369. That issue is not presented in this case.

The question here relates not to the failure of the court to investigate a claimed basis of incompetency (developmental disability), as the statute specifically requires, but the propriety of pretrial discovery of evidence of incompetency on both of the bases upon which it is claimed to exist. Although the statutory scheme relating to trial on the issue of competency does not specify the pretrial discovery that is allowable, we must assume it contemplates that which is necessary to ensure a fair trial and constitutionally permissible.

Section 1369 provides that upon commencement of the competency trial "counsel for the defendant shall offer evidence in support of the allegation of mental incompetence." (§ 1369, subd. (b)(1).) In the event "the defense declines to offer any evidence in support of the allegation of mental incompetence, the prosecution may do so." (§ 1369, subd. (b)(2).) If the defense does offer such evidence, then "[t]he prosecution shall present its case regarding the issue of defendant's present mental competence." (§ 1369, subd. (c).) "Each party may offer rebutting testimony, unless the court, for good reason in furtherance of justice, also permits other evidence in support of the original contention." (§ 1369, subd. (d).) Section 1369 does not suggest that the testimony of the expert or experts appointed by the court is

the only expert testimony that may be introduced at a competency trial. Considering that a party that wished to dispute the opinion of a court-appointed expert would be unable to do so effectively without the use of its own expert, the absence of an express statutory restriction on the use of such experts renders it highly implausible that the Legislature intended any such restriction. The Legislature must be deemed to have contemplated that the prosecution's "case regarding the issue of defendant's present mental competence" would consist primarily of the testimony of one or more retained experts, ordinarily the most credible and persuasive "evidence" as to that issue. (§ 1369, subd. (c).) As noted in *People v. Mayes* (1988) 202 Cal.App.3d 908 [248 Cal.Rptr. 899], "[i]f [the defendant] produces his own expert in support of the claim of incompetence, the prosecution is left with [the court appointed expert's] testimony . . . *in addition to any other evidence it may wish to present.*" (*Id.* at p. 917, fn. 5, italics added.) It is hard to imagine that the Legislature intended the parties to be able to retain such experts but to permit the defense to deny the prosecution's experts access to the individual whose competence is at issue, so that they could not credibly dispute the opinions of defense experts given full access to that person. The failure of section 1369 to explicitly authorize equal access cannot easily be construed as reflecting an intention to enable a defendant to deny it, because that would unfairly obstruct the truth-finding process.

Moreover, petitioner's reliance on the principle that "[i]n criminal proceedings . . . all court-ordered discovery is governed exclusively by—and is barred except as provided by—the discovery chapter [of the Penal Code]" (*In re Littlefield* (1993) 5 Cal.4th 122, 129 [19 Cal.Rptr.2d 248, 851 P.2d 42]; see also *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1312 [96 Cal.Rptr.2d 264])[3] ignores that fact that a competency trial under section 1369 is not a criminal proceeding. ▮ "Although it arises in the context of a criminal trial, *a competency hearing is a special proceeding, governed generally by the rules applicable to civil proceedings.*" (*People v. Lawley, supra,* 27 Cal.4th 102, 131, italics added; accord, *People v. Masterson* (1994) 8 Cal.4th 965, 969 [35 Cal.Rptr.2d 679, 884 P.2d 136]; *People v. Hill* (1967) 67 Cal.2d 105, 114 [60 Cal.Rptr. 234, 429 P.2d 586]; *People v. Fields* (1965) 62 Cal.2d 538, 540 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d 708]; *People v. Skeirik* (1991) 229 Cal.App.3d 444, 455 [280 Cal.Rptr. 175]; *People v. Superior Court (McPeters)* (1985) 169 Cal.App.3d 796, 798 [215 Cal.Rptr. 482]; *People v. Loomis* (1938) 27 Cal.App.2d 236, 239 [80 P.2d 1012]; 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000)

---

[3]Section 1054 provides that chapter 10 of the Penal Code (§§ 1054 through 1054.8) "shall be interpreted to give effect to all of the following purposes . . . [¶] . . . [¶] (e) To provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States."

Criminal Trial, § 697, p. 989.) The civil nature of a trial on the issue of competency vests the trial court with authority to utilize appropriate rules set forth in the Code of Civil Procedure, even though the underlying issue relates to the commission of a criminal offense. (See *People v. Stanley* (1995) 10 Cal.4th 764, 807 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Conrad* (1982) 132 Cal.App.3d 361, 367-368 [182 Cal.Rptr. 912]; see also *People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980 [114 Cal.Rptr.2d 760] and *Leake v. Superior Court* (2001) 87 Cal.App.4th 675 [104 Cal.Rptr.2d 767] [Civil Discovery Act of 1986 applicable to Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.)].)

The Civil Discovery Act of 1986 (Civil Discovery Act or Act)—which by its own terms applies to "a special proceeding of a civil nature" (Code Civ. Proc., § 2016, subd. (b)(1))—permits discovery "regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action." (*Id.*, § 2017, subd. (a).) The Act specifically authorizes mental examinations. (*Id.*, § 2019, subd. (a)(4).) A party desirous of obtaining discovery by such an examination is obliged to seek leave of the court by a noticed motion that specifies "the time, place, manner, conditions, scope, and nature of the examination, as well as the identity and the specialty, if any, of the person or persons who will perform the examination . . . ." (*Id.*, § 2032, subd. (d).) The motion must be accompanied by a declaration "stating facts showing a reasonable and good faith attempt to arrange for the examination by an agreement . . . ." (*Ibid.*) ▆▆▆ We hold that, subject to constitutionally mandated use limitations described later in this opinion, these provisions of the Civil Discovery Act apply to section 1368 hearings.

Although the Attorney General now agrees with this determination, that was not the position of the People at trial.

Erroneously assuming that discovery relating to competency hearings is governed by the Penal Code, the prosecution's discovery motion neither referred to nor complied with the requirements of the Civil Discovery Act. Moreover, the trial court's verbal order that petitioner "submit to an evaluation by a psychiatrist retained by the prosecution, *as requested by the prosecution in this case*" (italics added), incorporated the deficiencies of the motion into the order, which had the effect of granting the prosecution considerably greater license than the civil discovery statutes permit. For example, the motion asked the court to order "[d]efendant to submit to a

reasonable examination by duly licensed psychiatrists and/or psychologists retained by the People. The People anticipate that such examination would require no more than a maximum of five sessions, of no longer than four hours per session, scheduled between the hearing on this motion and February 15, 2002."

The failure of the motion to more specifically identify "the time, place, manner [and] conditions" of the requested examination, to limit its "scope and nature" to the question of mental competency to stand trial, to provide "the identity and the specialty, if any, of the person or persons who will perform the examination," and the failure of the prosecution to accompany the motion with "a declaration stating facts showing a reasonable and good faith attempt to arrange for the examination by an agreement . . ." violates the requirements of Code of Civil Procedure section 2032, subdivision (d). Among other things, the order permits unspecified individuals to examine petitioner at times and places of their choosing with respect to matters that may be unrelated to his competence to stand trial. Furthermore, as the Attorney General now concedes, the prosecution's request that the examination be videotaped, which was not made in the motion itself but in a written reply to petitioner's opposition to the motion, sought a form of recordation unavailable under the Civil Discovery Act. The Act permits mental examinations to be recorded only by means of "audio tape" (Code Civ. Proc., § 2032, subd. (g)(2)), and has been authoritatively interpreted to exclude videotaping. (*Edmiston v. Superior Court* (1978) 22 Cal.3d 699, 702 [150 Cal.Rptr. 276, 586 P.2d 590]; accord, *Ramirez v. MacAdam* (1993) 13 Cal.App.4th 1638, 1640-1641 [16 Cal.Rptr.2d 911]; see also *People v. Watkins* (1996) 45 Cal.App.4th 485, 489 [53 Cal.Rptr.2d 13].)[4]

Although petitioner did not at trial and does not here acknowledge any statutory authority for the discovery sought and granted in this case, which

[4]*Edmiston v. Superior Court, supra,* 22 Cal.3d 699, which was decided nearly a quarter of a century ago, expressed the view that "videotaping[,] with its heavy equipment and necessary additional personnel[,] would unnecessarily create a sideshow atmosphere at which taping was the main attraction, disrupting the medical procedures and prejudicing the effectiveness of the examination." (*Id.* at p. 702.) The Legislature must be deemed to still share this view because, although it amended section 2032 after *Edmiston* was decided, it retained the provision limiting the means of recordation to "audio tape." (Code Civ. Proc., § 2032, subd. (g)(2).) We, of course, defer to the judgment of the Legislature on a matter of this sort, but we do not think it inappropriate to note that the trial judge in this case, who was familiar with modern technology, was of a different mind. He stated that he included the videotape condition not simply "to preserve the record of actually what occurs in the interview," but because it would not be intrusive: "For the record, I have seen many statements given by defendants in this very courthouse in which they were not even aware they were going videotaped. . . . So I'm aware of situations where this can be done in a nonintrusive manner, particularly with protections of counsel, and their own experts being available to observe, in real time in another location, where this is occurring." In the view of the trial court, "the

he also challenged on constitutional grounds, he did call the trial court's attention to the failure of the prosecutor's motion to comply with the Civil Discovery Act, noting the "anomaly in the law" that would be created if the prosecutor in a criminal case was granted discovery on more indulgent conditions than would be allowed in civil proceedings. The point is well taken. The trial court had statutory authority to order petitioner to submit to a mental examination by an expert designated by the prosecution, but it did so in a manner that does not comport with applicable provisions of the Civil Discovery Act. Before discussing remedy, it is appropriate to address petitioner's constitutional claim.

## II.

### Compelling Petitioner to Submit to Examination Does Not Deprive Him of Constitutional Rights.

Petitioner contends that the court's order directing him to submit to examination, together with its ruling that the jury in the trial on the issue of competence could be informed of any refusal to comply with that order, violates his Fifth and Sixth Amendment rights.

### A.

 No court has explicitly determined whether an accused can refuse to submit to a mental examination on the issue of competency to stand trial

---

videotaping procedure, as long as this is not intrusive into the actual interview, is the best way to proceed, not only in this situation but perhaps in all situations."

The views expressed by the trial court indicate it agreed with the district attorney that videotaping would eliminate the need for defense counsel to be present during the examination. The district attorney supported his request for videotaping on the ground it would eliminate the need for defense counsel or any other third party to be present during the examination. As stated by the district attorney, "no competent professional that I've ever spoken to would ever permit a distracting influence in the room during the psychiatric examination." Appreciating that the prosecution requested videotaping so that defense counsel could be excluded from the examination, the defense argued that there was no "statutory provision that allows videotaping in the absence of the defendant's counsel or in the absence of an expert chosen by the defendant."

The Civil Discovery Act provides that "[t]he attorney for the examinee . . . , or that attorney's representative, shall be permitted to attend and observe any *physical* examination conducted for discovery purposes" (Code Civ. Proc., § 2032, subd. (g)(1), italics added) but contains no similar provision with respect to mental examinations. However, the provision of the Act according the examiner and examinee "the right to record a mental examination on audio tape" also states that "nothing in this article shall be construed to alter, amend, or affect existing case law with respect to the presence of the attorney for the examinee or other persons during the examination by agreement or court order." (*Id.*, § 2032, subd. (g)(2).) The pertinent case law is analyzed later in this opinion in connection with petitioner's Sixth Amendment claim. (See discussion, *post*, at pp. 503-505.)

on the ground of the Fifth Amendment, so that the refusal to submit cannot be used at a section 1368 hearing. Application of the Fifth Amendment turns upon whether a section 1368 hearing on competency, though nominally civil, may nonetheless be treated as part of the related criminal case or cause against the defendant, "or if the purposes of the Fifth Amendment and the nature of the proceedings otherwise demanded its application." (*People v. Samuel* (1981) 29 Cal.3d 489, 496, fn. 3 [174 Cal.Rptr. 684, 629 P.2d 485].) As our Supreme Court has itself noted, California courts have confusingly characterized the section 1368 hearing (and similar civil commitment proceedings) both as criminal and as civil "depending on the right or duty in question." (*Ibid.*) For example, the holding in *People v. Fields, supra,* 62 Cal.2d 538, 542-543 that an indigent accused has a right to appointed counsel in connection with a section 1368 hearing implies that the proceeding is criminal in nature. However, the statement in *People v. Stanley, supra,* 10 Cal.4th 764, that "the parties in a section 1368 proceeding are entitled only to the number of peremptory challenges provided for in civil trials, even if the underlying offense is punishable by death or life imprisonment" (*id.* at p. 807, citing *People v. Lawson* (1918) 178 Cal. 722, 228-729 [174 P. 885]), implies the proceeding is fundamentally civil in nature.

In *People v. Samuel, supra,* 29 Cal.3d 489, the California Supreme Court found it unnecessary to decide the question before us—whether a criminal defendant can assert the Fifth Amendment at a section 1368 hearing—but noted the "intricate and apparently tangled web of precedents relevant to the existence and extent of the privilege against self-incrimination in section 1368 hearings." (*Samuel,* at p. 496, fn. 3.) Because there is no precedent precisely on point, petitioner urges us to look for guidance to *Joe Z. v. Superior Court* (1970) 3 Cal.3d 797 [91 Cal.Rptr. 594, 478 P.2d 26] (*Joe Z.*), because, like the instant proceeding, it relates to the discovery allowable in a nominally civil proceeding that could result in a deprivation of liberty. *Joe Z.* related to the nature of pretrial discovery available to juveniles in delinquency proceedings, as to which the Welfare and Institutions Code was silent. Because section 2035 of the Code of Civil Procedure makes civil discovery applicable to special proceedings, and juvenile court proceedings are "essentially civil" proceedings (*In re Dennis M.* (1969) 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]), the juvenile in *Joe Z.* argued that the extensive discovery procedures generally applicable to civil proceedings are or should be available to minors in juvenile court. The Supreme Court agreed in part, stating that "the ' "civil" label-of-convenience' (*In re Gault* [(1966)] 387 U.S. 1, 50 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428]) cannot obscure the quasi-criminal nature of juvenile proceedings, involving as they often due the possibility of a substantial loss of personal freedom." (*Joe Z., supra,* at p. 801.) According to the court, "the need for expeditious and

informal adjudications in juvenile court [citation] belies the wisdom or necessity of any indiscriminate application of civil discovery procedures. [Citations.] [¶] Nevertheless, the quasi-criminal character of delinquency proceedings does lead us to conclude that the juvenile courts should have the same degree of discretion as a court in an ordinary criminal case to permit, upon a proper showing, discovery between the parties." (*Ibid.*) Considering the circumstances of the case, the court determined that the minor had made an adequate showing that pretrial discovery of his statements, admissions or recorded conversations was necessary for the preparation of his case; however, because he had not made such a showing with respect to the statements, admissions or recorded conversations of his former codefendants, the court found he was not entitled to discovery of that information. "Since the *Joe Z.* decision, discovery practice in juvenile delinquency proceedings has paralleled discovery in adult criminal cases. (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 53-54 [19 Cal.Rptr.2d 73, 850 P.2d 621].)" (*People v. Superior Court* (*Cheek*), *supra*, 94 Cal.App.4th 980, 995.)

Even though, unlike the juvenile in *Joe Z.*, he is arguing against the relatively generous discovery that may be had under the Civil Discovery Act, petitioner relies on the opinion in that case for the proposition that the " 'civil' label-of-convenience" should not be allowed to obscure the quasi-criminal nature of competency proceedings. We should find the Civil Discovery Act inapplicable to such special proceedings, petitioner contends, because of the danger it would provide the prosecution evidence relating to guilt, which is constitutionally impermissible. This argument does not stand up to scrutiny.

First, the situation in this case is not analogous to that in *Joe Z.* Unlike a delinquency proceeding in juvenile court, a section 1368 hearing is a collateral proceeding that cannot directly result in the functional equivalent of a criminal adjudication of guilt. Furthermore, the restriction on discovery petitioner would have us impose, which would effectively prevent the prosecution from independently presenting credible evidence of competency, would obstruct the search for truth far more than the balanced discovery allowed in *Joe Z.* Finally, and most importantly, petitioner has not and cannot show that requiring him to submit to examination by a prosecution expert would or could result in a constitutionally impermissible abuse of discovery. The precedent relevant to the application of the privilege against self-incrimination in section 1368 hearings may be "intricate" and "tangled," as Justice Mosk noted in *People v. Samuel, supra,* 29 Cal.3d 489, 496, footnote 3, but it is not incoherent. Essentially, courts have applied constitutional protections ordinarily available only in criminal proceedings to special proceedings of a civil nature, such as juvenile court and some civil

commitment proceedings (see, e.g., *People v. Thomas* (1977) 19 Cal.3d 630 [139 Cal.Rptr. 594, 566 P.2d 228] [commitment of narcotics addicts]; *People v. Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352] [commitment of mentally disordered sex offenders]), only where constitutionally protected interests at risk cannot otherwise be secured. That is not the case here.

The protection petitioner claims can only be afforded by application of the Fifth Amendment is in fact provided by a judicially declared rule of immunity applicable to all persons whose competency to stand trial is determined at a section 1368 hearing. This immunity, adopted by our Supreme Court in 1982 (*People v. Arcega, supra*, 32 Cal.3d 504), solves the problem finessed by the Supreme Court a year earlier in *People v. Samuel, supra*, 29 Cal.3d 489, 496, footnote 3.

The development and nature of the judicially declared immunity were recently analyzed by our high court in *People v. Weaver, supra,* 26 Cal.4th 876 (*Weaver*). *Weaver* held that it was error for the trial court to permit testimony at the sanity hearing from the same experts who had testified at the competency hearing conducted prior to trial (although the court also found that this issue was not preserved for appeal and defense counsel was not constitutionally ineffective for failing to object to the evidence). (*Id.* at pp. 957-963) The Supreme Court commenced discussion of the issue by reaffirming the holding in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61] (*Tarantino*), stating as follows: "In *Tarantino . . .* , the Court of Appeal concluded a psychiatrist appointed to examine a defendant for competency could not testify later on the question of the defendant's sanity. The court reasoned that because a defendant may not invoke his right against compelled self-incrimination in an examination for competency, 'neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity.' (*Id.* at p. 470.) Such judicially declared immunity was 'reasonably to be implied from the code provisions. The purpose of [an] inquiry [into competency] is not to determine guilt or innocence. It has no relation to the plea of not guilty by reason of insanity. Rather, the sole purpose . . . is the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a criminal charge. This purpose is entirely unrelated to any element of guilt, and there is no indication of any legislative intent that any result of this inquiry into a wholly collateral matter be used in determining the issue of guilt. . . . Both humanitarian and practical considerations call for a judicially declared immunity.' (*Id.* at p. 469.)

"We cited *Tarantino v. Superior Court, supra,* 48 Cal.App.3d 465, with approval in *Daly v. Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193], and then formally adopted its judicially declared rule of immunity in *People v. Arcega*[, *supra,*] 32 Cal.3d 504 . . . (*Arcega*). In *Arcega,* we expressly rejected the People's argument that *Tarantino* was incorrect, explaining the rule of immunity 'is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination. The rule also fosters honesty and lack of restraint on the accused's part at the examination and thus promotes accuracy in the psychiatric evaluation. Hence, the rule protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent.' (*Arcega, supra,* at p. 522; see *People v. Williams* (1988) 44 Cal.3d 883, 934 [245 Cal.Rptr. 336, 751 P.2d 395] [noting the rule in *Arcega*]; *People v. Harris* (1987) 192 Cal.App.3d 943 [237 Cal.Rptr. 747] [following *Tarantino* and *Arcega*].)" (*Weaver, supra,* 26 Cal.4th at pp. 959-960, fn. omitted.)

The *Weaver* court went on to note that its opinion in *Arcega* "also described the federal constitutional dimension to the rule prohibiting a psychiatrist from testifying to statements made in a custodial mental competency examination. 'Not only was the admission of the testimony of [the examining psychiatrist] a violation of state law, but as a recent United States Supreme Court decision establishes, it violated the federal Constitution as well. (*Estelle* v. *Smith* [(1981)] 451 U.S. 454 [101 S.Ct. 1866, 68 L.Ed.2d 359].) In that case, the high court ruled that the Fifth Amendment privilege against self-incrimination is generally applicable to custodial mental competency examinations, and specifically discussed the provision of immunity for statements made during such examinations. (*Estelle* v. *Smith, supra,* 451 U.S. at pp. 466-469 [68 L.Ed.2d at pp. 371-373].) The court ruled that a state may not introduce at the penalty phase of a capital case, evidence of statements made by an accused at a custodial mental competency examination unless the accused has been informed of and has waived his *Miranda* rights. In the absence of a valid waiver, the statements could only be used at the hearing on competency.' (*Arcega, supra,* 32 Cal.3d at p. 523, fns. omitted.)" (*Weaver, supra,* 26 Cal.4th at p. 960, fn. omitted.)

In the next paragraph of *Weaver,* the Supreme Court states: "It is thus clear that the testimony of [the psychiatrists who examined the defendant during the competency proceedings] was not admissible at the sanity phase of the trial *because defendant was not permitted to invoke his constitutional right against compelled self-incrimination before he spoke to the doctors.*" (*Weaver, supra,* 26 Cal.4th at p. 961, italics added.) Petitioner seizes on this sentence. Inferring that the failure to permit the defendant in *Weaver* to

invoke his right against compelled self-incrimination before submitting to a competency examination *erroneously* deprived him of his Fifth Amendment right, petitioner construes the sentence to mean that an accused has that right. If a defendant can refuse to submit to a competency examination on the basis of the Fifth Amendment, petitioner reasons, his refusal to submit cannot be used against him at the competency trial. This interpretation cannot be accepted because it renders the sentence manifestly inconsistent with the opinion in which it appears.

The defendant in *Weaver* never attempted to assert the Fifth Amendment. The court said he was not permitted to do so because *no defendant can invoke the Fifth Amendment at a competency examination.* The problem in *Weaver* was created by the fact that defense counsel did not invoke the judicially declared rule of immunity by objecting to the use *at the sanity trial* of the testimony of the court-appointed psychiatrists who conducted pretrial competency examinations. The court concluded, however, that even if counsel's performance was deficient, it was not prejudicial, and reversal was therefore not required. (*Weaver, supra,* 26 Cal.4th at pp. 961-962.)

The reasoning of *Weaver* embodies the assumption that the Fifth Amendment is inapplicable at a section 1368 hearing because the judicially declared immunity articulated in *Tarantino* and adopted by the Supreme Court in *Arcega* provides the defendant all the protection against self-incrimination he or she needs. As stated in *Weaver*, under the judicially declared rule implied from the code, " 'neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity.' [Citation.]" (*Weaver, supra* 26 Cal.4th at p. 959, quoting *Tarantino, supra,* 48 Cal.App.3d at p. 470.) The Supreme Court's opinion in *Arcega* points out that the judicially declared rule of immunity protects not just the public policy of not trying persons who are mentally incompetent, but "an accused's privilege against self-incrimination." (*People v. Arcega,* 32 Cal.3d 504 at p. 522.)

Petitioner's interpretation of *Weaver* would unreasonably permit him to assert a constitutional right he does not need to prevent the prosecution from using relevant evidence it may require to sustain its burden of showing, by a preponderance of the evidence at a civil proceeding, that the defendant is competent to stand trial. *Weaver* does not support this effort. The opinion in that case is fully consistent with the proposition that an accused who places his or her competency at issue and offers psychiatric evidence in support of

the lack of competency cannot on the basis of the Fifth Amendment refuse to submit to a court-ordered examination by a prosecution expert and prevent the jury that will determine whether he or she is competent from learning of the refusal.[5]

The sentence in *Weaver* that petitioner interprets as meaning that an accused can assert the Fifth Amendment privilege at a section 1368 trial appears immediately after a discussion by our Supreme Court of *Estelle v. Smith, supra,* 451 U.S. 454, in which the United States Supreme Court ruled that an accused need not submit to a custodial mental competency examination unless he has been informed of and waived his *Miranda* rights. However, the facts of *Estelle v. Smith,* and the Texas law applicable to the use at a criminal trial of information obtained in competency proceedings are significantly different from the facts of this case and the applicable state law. The competency examination in *Estelle* was initiated sua sponte by the court, not by the defendant, who never introduced psychiatric evidence or indicated he might do so. At the penalty phase, the state used information obtained from the court-ordered competency examination as affirmative evidence to persuade the jury to return a sentence of death. The United States Supreme Court found a Fifth Amendment violation because "the State used respondent's own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." (451 U.S. at p. 466 [101 S.Ct. at p. 1875].) *Estelle* holds that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any

[5]The Supreme Court's interpretation, endorsement and application of the judicially declared rule of immunity announced in *Tarantino, supra,* 48 Cal.App.3d 465, is consistent with the view we expressed 15 years ago in *People v. Harris, supra,* 192 Cal.App.3d 943, in which, relying on *People v. Arcega, supra,* 32 Cal.3d 504, we pointed out that "a *Miranda* [*v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]] admonishment is inappropriate where the trial court impliedly, or in this case explicitly, indicates, contrary to *Miranda,* that the defendant's statements during a section 1369 examination *cannot* be used against him. The granting of such immunity renders the giving of *Miranda* warnings unnecessary." (*Harris, supra,* at p. 949, original italics.) We were unwilling in *Harris* to accept the reasoning of the Fifth District in *People v. Stanfill* (1986) 184 Cal.App.3d 577 [229 Cal.Rptr. 215] because "if, as *Stanfill* suggests, a judicial grant of immunity need not be honored in the event the defendant takes the stand, the result not only undermines judicial assurances but violates the accused's right to due process notice concerning the privilege against self-incrimination." (*Harris, supra,* at p. 949.) We still believe *Stanfill* was wrongly decided, and the Supreme Court, which in *Weaver* cited *Harris* with approval (*Weaver, supra,* 26 Cal.4th at p. 960), apparently agrees.

However, our opinion in *Harris* conflicts with our earlier opinion in *Posner v. Superior Court* (1980) 107 Cal.App.3d 928 [166 Cal.Rptr. 123], not mentioned in *Harris,* holding that the privilege against self-incrimination was applicable in section 1368 proceedings. We believe *Posner* underestimated the breadth of the judicially declared immunity declared in *Tarantino, supra,* 48 Cal.App.3d 465, and cannot be reconciled with the subsequent opinions in *People v. Arcega, supra,* 32 Cal.3d 504, and *Weaver, supra,* 26 Cal.4th 875, and was therefore wrongly decided.

psychiatric evidence, may not be compelled to respond to a psychiatrist *if his statements can be used against him at a capital sentencing proceeding*." (*Id.* at p. 468 [101 S.Ct. at p. 1876], italics added.) The court also stated that if the defendant had been warned his statement to the psychiatrist could later be used against him at trial and he refused to answer the psychiatrist's questions, "the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose." (*Ibid.*) Stating the proposition differently, the court made it clear that if the information obtained by the psychiatrist during the inquiry into competency "had been confined to serving that function, no Fifth Amendment issue would have arisen." (*Id.* at p. 465 [101 S.Ct. at p. 1874].)

The situation presented in *Estelle* is obviously not presented in this case. ██ ██ Here it was petitioner, not the court or the prosecution, that raised the issue of competency to stand trial,[6] and petitioner indicated an intention to offer evidence of his lack of competency at the trial on that

---

[6]Petitioner implies, though he does not explicitly claim, that he has not genuinely placed his competency at issue, maintaining that "[a]ll defense counsel has done so far is to discharge his constitutional obligation to bring to the attention of the District Attorney and the Court a qualified expert's opinion that petitioner is incompetent to stand trial. [¶] Unlike the tactical decision to present evidence of diminished [capacity] or insanity, which is considered inherently voluntary since it is made by a competent defendant in consultation with counsel, defense counsel has no choice but to present evidence of trial incompetency to the trial court" (citing *People v. Masterson, supra,* 8 Cal.4th 965, 971). For this reason, defense counsel argued below that, unlike the situations in *People v. McPeters* (1991) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146] and *People v. Danis* (1973) 31 Cal.App.3d 782 [107 Cal.Rptr. 675], cases relied upon by the district attorney, "we're not in a voluntarily tendering a mental state in issue situation."

We cannot accept the suggestion that an accused whose lawyer has doubts about his or her competency to stand trial and fulfills the legal and ethical responsibility to call such doubts to the attention of the court can be deemed not to have himself or herself raised the issue of competency, and that evidence of incompetency presented by his attorney therefore cannot be rebutted without violating his Fifth Amendment rights. First of all, unlike the issue of sanity, which is litigated at a criminal trial in which the defendant possesses Fifth Amendment rights, which he waives only if he tenders his mental condition as an issue in the penalty phase (see *People v. McPeters, supra,* 2 Cal.4th at p. 1190), the issue of competency is litigated in a collateral civil proceeding in which the Fifth Amendment does not come into play because the danger it guards against is otherwise adequately protected by an immunity that can be invoked at the guilt trial. Furthermore, in *People v. Hill* (1967) 67 Cal.2d 105 [60 Cal.Rptr. 234, 429 P.2d 586], the Supreme Court noted that where an attorney has doubts about the present sanity of the defendant he should be able to make decisions on his or her behalf as to how the proceedings should be conducted. "When evidence indicates that the defendant may be insane it should be assumed that he is unable to act in his own best interests. In such circumstances counsel must be free to act even contrary to the express desires of his client. [Citation.] Conducting the trial according to the dictates of a defendant who, evidence indicates, may be insane, can result in prejudicial error. [Citation.]" (*Id.* at p. 115, fn. 4.) In *People v. Samuel, supra,* 29 Cal.3d 489, 495 the Supreme Court applied this reasoning to the decision of defense counsel to question competency, stating that the defendant's attorney "cannot be expected to seek approval of strategic decisions made in the course of obtaining and presenting proof of

issue. More importantly, in California, as is apparently not the case in Texas, information obtained from an accused at a mental examination conducted in the course of a competency proceeding *is* by rule confined to the issue of competency. In this manner, the judicially declared immunity preserves the neutrality of the section 1368 hearing. The judicially declared rule supplants the Fifth Amendment, because the scope of that rule is coextensive with the scope of the Fifth Amendment privilege.

The reasons the judicially declared immunity must be equivalent to that afforded under the Fifth Amendment were explained by the United States Supreme Court in *Murphy v. Waterfront Comm'n* (1964) 378 U.S. 52 [84 S.Ct. 1594, 12 L.Ed.2d 678] (*Murphy*), overruled in part on other grounds in *United States v. Balsys* (1998) 524 U.S. 666 [118 S.Ct. 2218, 141 L.Ed.2d 575], and *Kastigar v. United States* (1972) 406 U.S. 441 [92 S.Ct. 1653, 32 L.Ed.2d 212].

The petitioners in *Murphy, supra,* 378 U.S. 52, were subpoenaed to testify before the Waterfront Commission of New York Harbor, a bi-state body, but refused to do so on the ground that the immunity granted them under the laws of the states of New York and New Jersey did not prevent the use of their testimony to convict them of a federal crime. Overturning the rule that one jurisdiction within our federal system may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction, the Supreme Court held that the privilege protects state witnesses against incrimination under federal as well as state law, and federal witnesses against incrimination under state as well as federal law. (*Id.* at p. 57 [84 S.Ct. at pp. 1597-1598].) The court emphasized that this left the state witness and the federal government "in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." (*Id.* at p. 79 [84 S.Ct. at p. 1610].) In *Kastigar v. United States, supra,* 406 U.S. 441, the Supreme Court observed that "both the reasoning of the Court in *Murphy* and the result reached compel the conclusion that use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the [Fifth Amendment] privilege. Since the privilege is fully applicable and its scope is the same whether invoked in a state or in a federal jurisdiction, the *Murphy* conclusion that a prohibition on use and derivative use secures a witness' Fifth Amendment privilege against infringement by the Federal Government demonstrates that immunity from use

incompetence." This reasoning applies as well to the initial decision to place the defendant's competency to stand trial at issue, which counsel must also be able to do, even over the client's objection, on the client's behalf. We note, finally, that petitioner never objected to his attorney's questioning of his competency to stand trial and counsel never indicated petitioner had any such objection.

and derivative use is coextensive with the scope of the privilege. As the *Murphy* court noted, immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." (*Kastigar v. United States, supra,* 406 U.S. 441, 458-459 [92 S.Ct. 1653, 1664], fn. omitted.)

As earlier noted, our Supreme Court declared in *Weaver* that under the judicially declared rule of immunity applicable to competency hearings " 'neither the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt . . . .' " (*Weaver, supra,* 26 Cal.4th at p. 959, quoting *Tarantino, supra,* 48 Cal.App.3d at p. 470.) The *Weaver* court also adopted the statement in *Tarantino* that " 'there is no indication of any legislative intent that *any result* of [the inquiry into competency] be used in determining the issue of guilt . . . .' " (*Weaver, supra,* at p. 960, italics added.) Because the scope of the judicially declared immunity applicable to section 1368 trials is equal to that afforded under the Fifth Amendment, the court could justifiably conclude, as it did, that the rule adequately protects an accused's Fifth Amendment privilege against self-incrimination. (*Ibid.*) The judicially declared immunity operates to leave the defendant who submits to a competency examination and the People " 'in substantially the same position as if the witness had claimed the privilege' in the absence of a grant of immunity.' " (*Kastigar v. United States, supra,* 406 U.S. at pp. 458-459 [92 S.Ct. at p. 1664], quoting *Murphy, supra,* 378 U.S. at p. 79 [84 S.Ct. at pp. 1609-1610].)

*Estelle v. Smith, supra,* 451 U.S. 454, requires *Miranda* warnings to be given in connection with a competency examination only in the absence of "other fully effective procedures" that secure the privilege against self-incrimination. (*Id.* at p. 466 [101 S.Ct. at pp. 1874-1875]; see also Note, *The Fifth Amendment and Compelled Psychiatric Examinations: Implications of Estelle v. Smith* (1982) 50 Geo. Wash. L.Rev. 275, 287-288.) Because the use and derivative use immunity afforded under the judicially declared rule of immunity is "fully effective" to secure that privilege, *Miranda* warnings need not be given an accused ordered to submit to a competency examination, as we said in *People v. Harris, supra,* 192 Cal.App.3d at page 949.

 We hold that an accused person cannot on the basis of the Fifth Amendment refuse to submit to a mental examination by a prosecution expert when properly ordered to do so in connection with a section 1368 hearing. The Fifth Amendment does not come into play in this situation

because a judicially declared rule of immunity provides the necessary assurance that an accused will not be convicted of a crime by use of any information obtained at a court-compelled mental examination or the use of information obtained from that examination, or that his sentencing may be affected by such information or the fruits thereof. By allowing the prosecution to investigate facts crucial to the determination of competency without prejudice to the defendant, the rule of immunity also enhances the search for truth.

### B.

As noted, petitioner claims that the challenged order deprived him of rights under not just the Fifth Amendment but also the Sixth Amendment.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." In a line of cases commencing with *Powell v. Alabama* (1932) 287 U.S. 45, 57, 71 [53 S.Ct. 55, 65, 59-60, 77 L.Ed. 158, 84 A.L.R. 527], the United States Supreme Court has emphasized the "vital" need for the assistance of counsel during the pretrial stages of a criminal trial. As stated in *United States v. Wade* (1967) 388 U.S. 218, 226-227 [87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149], "It is central to [the Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." (Fn. omitted.) The right to counsel clearly applies to the type of competency proceedings with which we are here concerned. In *Estelle v. Smith, supra*, 451 U.S. 454, the Supreme Court found that the defendant's right to counsel attached at the time the trial judge informally ordered the state's attorney to arrange a psychiatric examination to determine whether he was competent to stand trial, which the court described as a " 'critical stage' of the aggregate proceedings" against him. (*Id.* at p. 470 [101 S.Ct. at p. 1877].) The court found that the Sixth Amendment was violated because defense counsel "were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." (*Id.* at p. 471 [101 S.Ct. at p. 1877], fn. omitted.) At the time the defendant had to make the critical and extraordinarily complex determination whether to assert his Fifth Amendment privilege, he was "without 'the guiding hand of counsel.' " (*Ibid.*, quoting *Powell v. Alabama, supra*, 287 U.S. at p. 69 [53

S.Ct. at p. 64]; see also *Powell v. Texas* (1989) 492 U.S. 680 [109 S.Ct. 3146, 106 L.Ed.2d 551] [6th Amend. right to counsel precludes a psychiatric examination concerning future dangerousness without notice to counsel.].)

The Sixth Amendment issue discussed in *Estelle v. Smith, supra*, 451 U.S. 454, is not presented here. The proceedings relating to petitioner's competency were initiated by his attorney and petitioner was represented by able counsel at all material times. Nor can a Sixth Amendment violation be found on the ground that the trial court did not specifically authorize petitioner's counsel, or his designee, to appear with petitioner at the mental examination it ordered. The issue whether counsel would be permitted to attend the examination ordered by the court was adverted to in connection with the prosecution's request that the examination be videotaped (see, *ante*, p. 499, fn. 5), but the prosecution never requested that counsel be excluded from the mental examination it sought, and in ordering that examination the court never excluded counsel. Furthermore, as earlier indicated, the Civil Discovery Act, which on remand must be complied with, does not explicitly require that an attorney for the examinee, or that attorney's representative, be permitted to attend a mental examination conducted for discovery purposes, as it does with respect to physical examinations. (Code Civ. Proc., § 2032, subd. (g)(1).) The Act simply defers to "existing case law with respect to the presence of the attorney for the examinee or other persons during the [mental] examination by agreement or court order." (*Id.*, § 2032, subd. (g)(2).)

Petitioner cites no case holding that a defendant has a Sixth Amendment right to be accompanied by counsel at a mental examination conducted in connection with a competency proceeding, and we are aware of no such holding.

In *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], a death penalty case, a court-appointed psychiatrist testified at the guilt trial as to the defendant's incriminating statements. The Supreme Court held that, in those circumstances, the defendant was deprived of a constitutional right to the presence of counsel at the examination. The court explained, however, "that the presence of counsel at the psychiatric examination is not constitutionally required so long as the court does not permit the psychiatrist to testify at the guilt trial. If, however, defendant at such trial specifically places his mental condition into issue, the psychiatrist's testimony is admissible, provided that the court renders a limiting instruction that the jury should not regard the testimony as evidence of the truth of defendant's statements so related by the psychiatrist." (*Id.* at p. 403.)

Relying on *Spencer*, the Court of Appeal in *Tarantino, supra*, 48 Cal.App.3d 465, held that when a mental examination of an accused is

ordered under section 1026 to determine the issue raised by a plea of not guilty by reason of insanity, "the presence of counsel at the psychiatric examination is not constitutionally required as long as three conditions are met: (1) counsel is informed of the appointment of psychiatrists; (2) the court-appointed psychiatrists are not 'permitted to testify at the guilt trial' unless the defendant places 'his mental condition into issue at the guilt trial'; and (3) '[i]f defendant does specifically place his mental condition into issue at the guilt trial,' and the psychiatrist testifies, the court must instruct the jury that his 'testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements,' but 'may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion.' " (*Id.* at p. 469, quoting *In re Spencer, supra,* 63 Cal.2d at p. 412.) Concluding that a defendant afforded these protections is not entitled to counsel at a court-ordered psychiatric examination, the *Tarantino* court went on to state that, "[n]onetheless, the trial court, 'in its discretion' may permit counsel to be present as an observer, that determination to turn in substantial part upon the attitude of the psychiatrist." (*Id.* at p. 469.)[7]

The judicially declared rule of immunity that protects petitioner's Fifth Amendment right against self-incrimination concomitantly protects the interest that might otherwise entitle him to a Sixth Amendment right to counsel at the court-ordered mental examination on the question of his competence to stand trial. Because he is adequately protected, there is no Sixth Amendment right.

For the foregoing reasons, a proper order directing petitioner to submit to a mental examination would not violate petitioner's rights under the Fifth or Sixth Amendments to the United States Constitution or counterpart provisions of the California Constitution.

### III.

#### *Conclusion*

Though not constitutionally defective, the order directing petitioner to submit to a mental examination by one or more experts designated by the

---

[7] In *Estelle v. Smith, supra,* 451 U.S. 454, the United States Supreme Court also indicated doubt that there is a constitutional right to counsel at a court-ordered mental examination. Observing that the defendant in that case "does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination," the court noted with seeming approval that "[i]n fact, the Court of Appeals recognized that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.' [Citations.]" (*Id.* at p. 471, fn. 14 [101 S.Ct. at p. 1877].)

prosecution does not comply with the Civil Discovery Act and, accordingly, must be vacated. As we have explained, the prosecution did not seek leave of the court in the manner prescribed by Code of Civil Procedure section 2032, subdivision (b); as a result, the order directing petitioner to submit to examination, which simply grants the prosecution the relief it sought, fails to adequately specify the time, place, manner, conditions, scope, and nature of the examination, as required by that statute, and improperly allows unidentified examiners to videotape the examination.

▮▮▮ If the prosecution renews its request that petitioner submit to mental examination by an expert it designates and petitioner does not agree, the prosecution may, in the manner prescribed by Code of Civil Procedure section 2032, file a motion asking the trial court to direct such an examination. Upon good cause shown, the court may order petitioner to submit to a mental examination, specifying the prosecution expert who may perform the examination, and "the time, place, manner, diagnostic tests and procedures, conditions, scope and nature of the examination," as required by subdivision (d) of section 2032 of the Code of Civil Procedure. In the event the court issues such a discovery order and petitioner refuses to submit, the court, on motion of the prosecution, may make those orders that are just, including imposition of the issue and evidence sanctions specified in subdivision (f) of Code of Civil Procedure section 2032, which includes disclosure to the jury of a refusal to comply with the order directing him to submit to examination by the forensic psychiatrist retained by the prosecution.

Let a peremptory writ of mandate issue directing respondent superior court to set aside its order of February 1, 2002, granting the motion to direct petitioner to submit to a mental examination and to entertain a new motion that is in conformance with the views expressed in this opinion. The stay of proceedings previously imposed is lifted.

Haerle, J., and Lambden, J., concurred.

Petitioner's petition for review by the Supreme Court was denied October 16, 2002. Kennard, J., Brown, J., and Moreno, J., were of the opinion that the petition should be granted.